The Honorable, the Judge of the United States Court of Appeals for the Fourth Circuit Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention to the court of law sitting. God save the United States and His Honorable Court. Please be seated. Good morning, everybody. Welcome to the Fourth Circuit. We have two cases, actually three, I guess, and two have been consolidated this morning. So, Mr. Skaggs, whenever you're ready, sir. Yes, Judge. Do you want to address your issue? Yes, Your Honor. May it please the court, Paul Griffiths, on behalf of the appellees, by joint agreement, we have just a very brief housekeeping matter, if I could address that. Certainly. Thank you. The appellants put together errata sheets. There were two of them, and they had six different errata. We wanted to advise the court that we do not object to any of that. Okay. Secondly, on behalf of the appellees, and very briefly, in the nitty brief at page 20, the nitty response brief, appellees' response brief at page 20 and at page 27, the appellees correctly cited, provided the correct citation. They also referenced the judge correctly. They referred to the case, the court the case came from, incorrectly. Counsel agrees that that should be changed as well, counsel of the appellants. In the Leeson response brief at page 19, there is a reference to the Lipp decision, L-I-P-P, and the citation should be 2017 WL 253 162. Thank you. You'll never hear me object to something like that. Yes, sir. Thank you, Mr. Kronos, for bringing that to our attention. Thank you. All right. Mr. Skaggs? Yes, if it pleases the court, I'm John Skaggs from Charleston, West Virginia. I represent the appellants in these consolidated cases, plaintiffs below. And... Mr. Skaggs, it's entirely up to you, but if you want to remove your mask, you can. I'll leave it up to you. Well, I want to set a good example. We understand. Go ahead. I've been, I haven't. It changes your perspective. And I don't mean to pressure you in any way, sir. If you want to leave it on, that's fine. I just didn't know whether you understood that you could. I've been trying to figure out an efficient way to address the core of the situation. We've tried to brief it as thoroughly as we could with the various duty of care cases. And you've got the situation, of course, where you have a tort type duty of care under that Aikens case. And we have also a claim, particularly with Ellswick, based on the assumption of the lease and rent. But to me, I think what I want to get across starts with the infamous email that was sent to Mrs. Booker at Wells Fargo. Because I think that will establish several different points for each of those types of theories. And what she said is what he said was this area there, Mrs. Booker. Hope you were well. Please find the attached enclosed disbursement request for care retail group. Which has been submitted to CMS reserves on January 21st, 2016. And he says, we have two critical repairs. We would like to ask for you to please expedite release. And first, right off the bat, he uses the term critical repairs. And so if you look at it from the standpoint of... Can I ask you a question about that? Yes, sir. The party that you're referencing is asking for a disbursement request from the bank. But doesn't the agreement require that the repairs be made up front and then reimbursement be sought later? Well, I saw that in the decision that was filed by the defendants on April 27th. Because that's in Judge Bailey's decision. I don't know because we didn't have discovery in this case. This is back on a motion to dismiss, of course. The way I read... Are you saying that's not in this record? No, I don't think the entirety of the document that governs that is in the record. I do have a copy of it. The way I read it is... I did not read that as being something they had to do in advance. My understanding was... And I'm looking at page 82 of the document that was filed below. Let's see. The borrower shall submit a request for payment to lender at least 30 days prior to the date on which the borrower requests such payment to be made and specifies the required repairs to be paid. So as I read that, it's a situation where... And I think it's fair to say that's what he was contemplating. It's a situation where they can go to the Wells Fargo and say, You're holding this accumulation of funds and we have a critical urgent need and will you pay us? Okay. And I don't want you to get bogged down in these details. But I guess maybe the broader question is, I mean, this lender agreement is typical of most agreements that I've seen that essentially absolves the lender any responsibility to do much of anything. So what is... What makes this case different? Why can't we just... Why don't we just simply enforce the agreement that the parties enter into? Because I think in looking at the law that governs here and the foreseeability issues, in this unique situation, and I'm not out to undermine secure mortgage bonds, you know, but in this unique situation, Wells Fargo took into a hard lockbox the entirety of the rents that were paid by the tenants. And in fact, I did not realize this until I was interviewing Judge Bailey's decision filed last week. But apparently, I'm looking at page 12. Let's see if that's it. They had multiple loans like this. So again, you've got a situation where Wells Fargo has three of these types of loans with this one party. And so you've got the situation, I think, under Aikens v. DeVoe, the economic loss case, and under conventional foreseeability and duty of care law for Wells Fargo because they're taking all the money. Can I ask you about that? Yes. Are you arguing that a test other than the economic loss test applies for your negligence claim? Yes. So you're saying the court below erred in applying the economic loss rule or just that they applied it incorrectly? Well, I think it's multiple situations, if I may answer that way. As to the tenant, I think that's clearly an economic loss rule. All right. And then I also argue that there's a general duty of care at all times to comport yourself as a reasonable person. And that, of course, would be applicable, I think, across the board because our point is that Wells Fargo had the money, had the authority, had the powers of attorney to act to prevent this ridiculous situation from happening. And if you look at the way they talk about foreseeability and duty of care, you look at the consequences of acting, what the burden will be on the defendant, what happens if they're required to do something, what happens if they aren't. The burden of guarding against this event was $24,000 against a multimillion dollar loan on this property at a time when they had $227,000 in the lockbox. Can I ask you this a different way? I understand your broad statements of law that you assert apply here, but have you identified any case where an assignment was construed to delegate duties, even though the assignment says in about as clear language as you possibly can, this assignment does not delegate any duties at all? What is the case that actually imposes liability when there's an agreement that says that? Well, I think that Lyft case does. And again, I think to me, the answer to your question goes to the multiple statements by the lower courts that we're going to open the floodgates. There are going to be hundreds of cases. There's going to be this awful situation with people abusing this. This is a very unique set of circumstances. You have a uniquely cited shopping center, one way in or out, these very sophisticated financial institutions loaning money on. You've got the issue of the hard lockbox, which I think is important. This is not a case where the landlord pays his interest, principal, and whatever the agreed to escrow amounts might be. They took all the money. And our argument, of course, on the assumption of leases and rents, which was filed, and it's a public document, it's a lease. It's put in the court record, the property record. The point of it is it says full, complete, and not for security purposes only. I don't want to take us too far afield, but I do want to give you a chance to respond to something that bothers me. I'm not at all convinced that there is an adequate pleading of subject matter jurisdiction in NITI. I don't see where in the complaint it alleges there is complete diversity between the parties. This only affects NITI. It doesn't affect the other case. But could you, I guess, attempt to address for me why I shouldn't conclude that there are inadequate allegations of subject matter jurisdiction? I didn't anticipate that. She's a resident of the state of West Virginia. Maybe I'll tell you. I'm looking at the complaint. I might have inartfully pleaded her residency. So paragraph one says she's employed by Kmart, a shopping center in West Virginia. That doesn't allege that she is a resident of West Virginia. No, you're quite right. That was inartfully pled if that's the case. I can represent to you that she is, in fact. And then paragraph four, I guess, says COM 2013 CCR 12 LLC is a New York common law trust. Its address is in Cincinnati, Ohio. I'm not sure that we've alleged the jurisdiction of all the defendants either. I'm not going to argue with you. I don't know how else to answer that. It is inartfully pleaded. If it isn't clear from the complaint that she's a resident of West Virginia, then that's inartful pleading on my part. And I apologize. I don't know how else to answer your question, Judge. Understood. I didn't want to give you a chance to answer it, so please go ahead. So to me, we come back to the ALR. And as I argue, I think the language regarding this doesn't apply to us. Well, number one, the contract itself is inherently contradictory. What does it mean? If it says at the beginning, a full, complete assignment of leases, not rent proceeds. Leases and rents and not for security purposes only. And then later on, buried in the bottom, it has this exclusionary language. To me, you just have to look at the entirety of the document and the transaction. And I think the conclusion is, in this unique circumstance, Wells Fargo, by reason of its conduct and the course of dealing between it and, well, whatever they call themselves, Pera, the property management company. What do you mean by course of dealing? Because is there any evidence in the record that they undertook repairs before? Well, that's, again, we're back to Judge Bailey's decision. Because he indicates in there, as part of their facts, that there was back and forth between these two companies. And that there had been some form of intercourse in the past where they did have repairs and they did follow this. We paid for it. The problem is this is a motion to dismiss on our part. And I can't really say because we haven't had the discovery on that particular issue. And that's one of the things that's hanging out there that could make a difference in these cases. Because where you characterize it as a special relationship or a limited, look, I'm down to 35 seconds. Whether it's a special relationship or however you look at it, those special circumstances could well turn on the course of dealing in the past between the parties. So I'm down to 22 seconds and I will, unless you've got other questions, I will sit down. Thank you, Mr. Skaggs. You've got some time left for rebuttal. Mr. Cronus? May it please the Court. Paul Cronus on behalf of the Appalachians. I think where I will start is to briefly address some of the points that we just heard. The court asked appellant's counsel, essentially, why is this case different? What is different about it that justifies the relief that they're seeking, which is that these claims should be sustained? And the answer is that this case is not different. It is not different from the law that is already well established. The facts do not create a difference at all. What would be different? What would be different is if the court were to allow these types of claims, as attenuated as they are, to be a basis for recovery. In which case, it would not only be a derogation of the law, but it would also create a practical reality that the law is not designed to support. And what I mean by that specifically is, what would the commercial lending market be if they could never underwrite the liability for making a loan with respect to, for example, a commercial shopping center like this one? Mr. Cronus, can I ask you what I think is the hardest thing in this case for you? And that involves the tenant. So assume, for the sake of argument, that I'm persuaded by the arguments about employees and neighbors. And those seem covered by a traditional pre-economic loss rule. But this tenant thing is very strange. And I guess when you open by saying, what makes this case different? I mean, what makes this case different is that your client took all of the rent money and then asserted the ability to veto capital expenditures. Or at least veto reimbursement for capital expenditures to maintain the very property being secured. That strikes me as unusual. And it strikes me as potentially a difference between the typical case. I mean, I've not been doing this for a long time. But it seems to me strange that you insist on taking all of the rent money and then saying you have to sign off on repairs and then argue that there is no duty whatsoever, even if you unjustifiably refuse the right to make repairs. Would you like to address that? I would, Your Honor. Thank you. First and foremost, the loan agreement bargain for, which was executed by the parties, says what it says. And it sets up the very specifics of, I believe, everything that Your Honor has raised. It blesses them. It condones them. They got millions of dollars. And they chose to and did enter into certain— Well, wait, wait, wait. No, no, no. Tara got millions of dollars. The people whose businesses were interrupted and disrupted did not get millions of dollars. Tara got millions of dollars. I mean, I know the problem in this case is that Tara is bankrupt, that in any sensible world they would sue Tara, not you. But Tara is bankrupt. So that's the sort of background of all of this. But the tenants didn't get millions of dollars. So it makes total sense why Tara would agree to this. But I think there is some force to the argument of, well, the tenants didn't bargain for this. You're right. I was referring to Tara, Your Honor. It was not referring to the tenants themselves. No, the tenants did not. But the tenants aren't a party to any agreement with the appellees in this case. They are not, as a matter of law, the sole beneficiary, which, you know, they could try to make a claim for that. They have, and it is not supported by the law. In other words, they simply, while I understand the peculiarity that the court is referencing, it's simply not supported by the law then that they can make a jump and say, yes, I'm a tenant. And by being a tenant alone, without any contractual relationship, without any special relationship, without any fiduciary relationship, that alone is sufficient for me to be able to bring in support this claim. Well, okay. Can I follow up a question on that then? So you said there is no contract. I totally agree. But, I mean, the whole notion of special relationship is that sometimes there are people who don't have a contract who can nonetheless sue on the obligation. So could you, if you're saying they don't have, you just said they don't have a special relationship, could you give me an example of what would create a special relationship with Wells Fargo? Like, what is the factual scenario where someone who is not a party to the loan agreement would have a special relationship? Sure. I can think of a possibility, and a possible special relationship would be that which the lessee has with the owner of the building, with the landlord themselves. There is that relationship. Here, we don't have that. Hold on. The lessee has a contract with the owner of the building. They don't need the special relationship test. Those folks have a contract. That's true.  So I don't think you can give me an example where people have a contract. What is an example where there is not a contract between Wells Fargo and someone, but Wells Fargo would have a special relationship? Well, if, for example, we were talking about a fiduciary relationship, right, as being a form of special relationship, the law on that is clear. And the law says that the party seeking to prove that relationship has to repose confidence into the party who is purported to have the fiduciary obligation. And in exchange, that party who has a fiduciary obligation has to acknowledge that they are aware of that reposing of confidence. That is not the facts here under any stretch. And it's not just because, Your Honor, there's no contractual relationship. It's because there is no demonstration of that confidence in either direction that could possibly cause them to repose confidence. So I assume that Tara could sue your client for unjustifiably withholding these funds, right? I wouldn't agree with that, Your Honor. So is your question that your client has – I guess that's the question. The question says that Tara had to ask your client if they would disperse funds for repairs. And is your view that the contract gives your client the exclusive, despotic, arbitrary authority to deny reimbursement whenever it feels like it, for whatever reason it feels like it? Well, if we're talking about the – Tara and your client. Tara and your client clearly have a contract. So I'm trying to think about if Tara could have sued your client for breach of contract. Right. So if we're talking about the Tara and appellee relationship, I mean, first, we've got all the issues that they haven't responded to with respect to Wells Fargo not being a party to most of the contracts, only one. And secondly, Your Honor, with respect to that specific relationship, the court has – the district court has already ruled in the case between Tara and the appellees, the court – the district court has already ruled that there was no relationship. And as a matter of law, throughout very similar, if not just the same types of claims that are before this court with respect to significantly more attenuated claimants than the – than Tara itself. So my response to Your Honor would be can they sue? No. My answer would be they did sue, they lost, and they lost on these same types of claims. Let me address a couple of other issues going directly to that which the appellant's counsel raised. Actually, if I could just finish on the first one, I was talking about the practical reality of treating this case differently, of creating what we believe would be new law. And I started to say that you just couldn't make commercial loans. And the point that I was going to make is this. Loans are made pursuant to an underwriting process. What is my liability if I make these funds, if I commit them in a certain way? And how could a lender ever gauge – use the law – use the law to gauge what its liability will be? How can I get, if not certainty, relative certainty, or at least enough understanding and comfort to make a loan given the status of the law? And here, it's a runaway. You would have employees of companies who get terminated or your company goes out of business, they lose their job, it's unfortunate for sure, but you can't account for that. You can't account for people off-site as here, as one or more of the plaintiffs is, who have alleged damage to their house, allegedly that goes derivatively all the way back step after step. You could never make a loan under those situations. The only reasons why these loans could be made, in my view, would be because we have the law as it is, which defines what the duty and relationship is. I'll move on to the next point. The question was asked about whether or not the argument concerning 6.4.2 had been raised in the record, and I'd just like to state for the record that Judge Flatley cited to Section 6.4.2 in his decision, and the appellants themselves cited to 6.4.2 in their respective reply briefs, both in the Neeson case at page 18, and I'm sorry, the Nitti case, I misspoke, I apologize, at page 18, and the Leeson case at page 18, and that's both of their replies. And Section 6.4.2 provides, among other things, that the borrower had to satisfy these conditions proceedings, which we had just discussed, that that is the process by which the repairs would have to be done. The borrower would have to do it. They would then come and get reimbursed as appropriate. Why am I raising that question or raising that point? Well, I'm raising it for two reasons. One, to establish that, yes, it was in the record. And two, to demonstrate that when we refer to 6.4.2, we're talking about the borrower's obligation, and the way that they've structured their claims appear to be based on a piggybacking of various different agreements to ultimately get themselves to be seen as stepping into the shoes of the borrower. My point made more plainly and more simply is this. These attenuated plaintiffs, the appellants, can't get greater responsibilities, greater rights, I should say, greater rights and benefits than the borrower itself had. That would be extraordinary. And the borrower doesn't have the rights either. And these attenuated appellees certainly can't get more appellants, can't get more than the borrower had. Another point. Part of the thesis of the appellant's approach is that there was money to be had. If only the money would have been spent, this whole thing would have been avoided. You just should have made the repair. Well, again, and I'm not going to belabor it. Frankly, I think I already have. The loan agreement says what it says. The obligations are what they are. But even beyond that, the ability to pay for something is different than the obligation to pay for something or to do something. And I think that's a material distinction here. I understand the desire to say, well, you have money, you just should have done it. But the world doesn't work that way, and it particularly doesn't work that way when you have a series of agreements that define the party's rights and obligation. Ability does not equal duty. And you can't try to cobble together a duty based on the fact that someone had the ability to do something, particularly when that which it supposedly should be doing is exactly the opposite of what's set forth in the loan documents themselves. I also want to address an issue that came up with respect to what case law there is that says that an assignment is binding on a party. An assignment of duties is binding on a party where there is an express exclusion of such an assignment. And obviously here we have that. There is an assignment of leases and rents, but in that ALR, as we refer to it, it specifically disclaims that. The answer is I do not believe that they have cited a case for that proposition, which to me is endemic of another sort of theme, thesis here, which is it's about a bad thing happening. A flood. People lost money. People had, you know, different kinds of problems. But that's separate and apart from relying on the law that gets you there. And here this is just another way of trying to create this duty when there is none. Because, again, I don't think they've cited that case. Another thing that the appellants haven't seemed to directly attack certainly didn't bring it home. Your colleague did mention a case, and I confess I didn't hear the name clearly. Did you hear the name of the case? I did not hear that either, Your Honor. But I'm interested. What was the name of the case? Lip versus ginger. You want to talk about that? I do, Your Honor. So, Your Honor, the Lip case held that an equitable owner of property, in other words, an entity that had entered into a contract for the purchase of the property, entered into the contract, didn't actually own the property, may owe, may owe a due process. So, it's a duty of care to individuals injured on the property when that equitable owner has possession or control of the premises. And a few things. First, we're not talking about an assignment of leases and rents like we're talking about here. Second, this was a case under Missouri law, and we believe that it is not applicable to these proceedings. The Lip ALR, different from ours, was in the context, actually the court's treatment, I should say, the court's treatment of Lip was, of the ALR, was in the context of a defendant that was under contract to own the premises. So, the court analyzed the defendant's potential liability only after finding that the defendant was a, quote, equitable owner by virtue of the property sale contract. Here, and unlike in Lip, the Pelleys did not own the mall, were not under contract to own the mall, nor did they possess the mall. Therefore, Lip is completely the opposite. Do you have a response to the subject matter jurisdiction issue that my colleague raised in the needy case? Well, I wouldn't respond. I want to look back into that, and I would say the jurisdiction can be addressed at any point in time, and that is something that we will look into. Anything further? I'm sorry? Do you have anything further? I do, Your Honor, if I may. I had mentioned just very briefly, and I just want to make the point firmly, which is, with respect to Wells Fargo, there are precious few references to Wells Fargo specifically, and specifically with respect to a contract, contractual relationship that they had. What I would point out is, in the briefs, what we believed we saw was, again, this sort of cobbling together of provisions, cherry-picking here, cherry-picking there. And we also saw together a fairly, I guess I'd call it casual use of identifying the parties, casual way of identifying the parties. And it was, you know, all of the defendants at the district court level, all of the appellees. But the fact of the matter is that they are different in the way that they are situated. Wells Fargo and the trust entered into different contracts, and I don't believe that they had – we have set forth the specificity with respect to that in our briefs, and we're comfortable with what we have there. But I think that the lumping them together, Wells Fargo together, the two appellees together, is part and parcel of this really desperate way to try to cobble together some liability where there isn't. And I'll close with this. I understand that this was an unfortunate situation. Nobody hopes for this kind of thing. Nobody hopes for this kind of a flood. But the contracts are what they are. The law of negligence is what it is. And to create liability here, we believe, would be very inconsistent with the existing law. Thank you very much. All right. Thank you, Mr. Cronus. Mr. Skaggs? Yes, Judge, if I may. I don't need to wait for the top. There we go. I guess I've got seven minutes. 6.59. In response to what he had to say in my mind, you know, he said, well, find another case. What that tells me is this is a very unusual situation. And you can afford relief in this unusual situation based on well-established principles of liability, tort slash economic loss liability, and under the contract, and not throw over the multibillion dollar securitized loan business. The problem I think you've got is this is a very sophisticated people that put this deal together. And if you look at the prospectus, it's very detailed. And they have many, many people involved in this transaction. They could have written this document any way they wanted to. And Mr. Abbruzzino was in bankruptcy at the time. The $13 million plus went to pay off loans from his prior bankruptcy. So it wasn't a cash transaction to him. It was an evening out the liability. They chose to write it the way they did. And what you've got, I think, is you have to look at the entirety of the documents. They all come into play. It's one transaction, the case management agreement, deed of trust, the loan agreement, and so on. They were laid out in the pleadings. Those all fit together. And one of the things they have in them are these multiple powers of attorney from Tara slash Mr. Abbruzzino to the other parties. They had every ability to do that which they should have done. Okay, so your front of the other side's argument is banks have to be able to lend money without taking on liability. And I heard you just say they could have written the contract anyway. So how would Wells Fargo have written this contract to make clear that it cannot be held liable for something like this? Well, the first thing they do, they could have changed it from assumption of leases and rents. Presumably they want the rents in order to secure the loan on this risky transaction. Right, but in addition to rents, they assumed the leases. And, of course, under the restatement of tort section, I can't remember 308, it's in the papers, an assignment includes unperformed duties if it's an absolute assignment. So they did not have to make what sounds like an absolute assignment. All they had to do was configure this particular transaction for this unique situation. Nobody told them to loan money on a shopping center in West Virginia that had one way in and out of it. That is in the record. And the one way in and out of it was in the floodplain. And that was noted in the prospectus as a negative characteristic by the appraisers. So, I mean, I don't know what to say about it. They chose to enter into this arrangement. Under West Virginia law, Aikens versus Debeau, however you want to characterize West Virginia's characterization of liability, they chose to do that. And this was an awful situation. It happened about 6 in the evening. People were stranded overnight. And I understand, I'm a lawyer, I tell clients all the time, yes, the fact that that car could have hit you doesn't mean it did. But they were very fortunate that there wasn't a fire. Somebody didn't have a heart attack and die. Gas lines were ruptured. This site had at least one, I can't remember if the Kroger Fuel Center was an open center, had underground storage tanks and gas stations, multi-story buildings. So, you know, they knew everything they needed to know about this situation. And you want standard of care, are they really telling me that every bank in the United States of America confronted with a situation where we need $24,000 to protect our $13 million investment, would not fix it, and then evict or terminate the deal, foreclose, sue Mr. Abbruzzino, exercise other remedies, who would allow this to get to this point? So my argument is, I don't know how else to say it, they broke it, they bought it. And when you look at all of those agreements, the way they fit together, yes, they're all over the lot. It was a one-size-fits-all transaction that attempted to maximize the bank's profit, interest, and ability to act, minimize their duty. That's not the law, is it? You have a duty to use reasonable care under the circumstances. So that's the essence of my argument. I'm down to a minute 46. I don't know. Let's see. That was basically my response to ability versus obligation. We contend they did, in fact, have an obligation. It was confronted with. So with that, unless the Court has any further questions for me, I'd be happy to sit down. All right. Thank you, Mr. Skaggs. I want to thank, on behalf of the panel and both counsel, for their arguments. In normal times, we would exercise our tradition to come down from the bench and greet you personally. Obviously, we're not going to do that here today. My hope is at some point down the road, we'll be able to get back to that, but today is not the day. But please know that we're grateful to you for your arguments and appreciate your being here with us this morning. The case has been submitted, and we'll move on to our second case. Yes, Judge.
judges: Albert Diaz, Allison J. Rushing, Toby J. Heytens